In re Ronald A. PYE and Judith E. Pye, Debtors.

EASTERN LEASING CORPORATION, Plaintiff,

v.

Ronald A. PYE and Judith E. Pye, et al., Defendants.

Bankruptcy No. 279–00683.
Adv. No. 279–0003.

United States Bankruptcy Court, D. Maine.

Aug. 18, 1981.

Gregory Tselikis, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for plaintiff.

Thomas G. Ainsworth, Portland, Me., for defendants Pye.

Thomas F. Malone, Jr., Gorham, Me., Trustee.

## MEMORANDUM DECISION

FREDERICK A. JOHNSON, Bankruptcy Judge.

In this proceeding the Plaintiff, Eastern Leasing Corporation, seeks relief from the automatic stay of Section 362(a) of the Bankruptcy Code [11 U.S.C. § 362(a)] in order to pursue a replevin action pending in State Court. Eastern's complaint is based upon a "Lease Agreement" executed by the Plaintiff and the Debtors on or about July 27, 1978. The Chapter 7 Trustee resists Eastern's complaint on the ground that the "Lease Agreement" is not a true lease but, rather, a lease intended as security within the meaning of Section 1–201(37) of the

**308**

Uniform Commercial Code [11 M.R.S.A. § 1-201(37)].[1]

The Court agrees with the Trustee's position.

### -FINDINGS OF FACT-

On November 20, 1979, the Debtors, who formerly operated a small grocery store known as "Ron's Superette," filed their voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

On July 27, 1978, the Debtor and Eastern Leasing Corporation entered into a "Lease Agreement" (agreement). The agreement provided that certain store equipment, the subject of this proceeding, would be purchased from a supplier, Holden Refrigeration Company, and installed in Debtors' grocery store located on U.S. Route # 1 at Woolwich, Maine. The pertinent provisions of the agreement follow:[2]

The "Total Principal Amount," (presumably the price of the equipment installed) was $45,000;

Debtor paid an "Advance Payment" of $4,557.25. The agreement provided that the advance payment would be held as "security for lessee's performance of its obligations under the lease."

The agreement called for eighty-four (84) monthly payments of $868.05 plus a monthly sales tax "if applicable" of $43.40 making a total monthly "rental payment" of $911.45;

The agreement provided that "this lease shall not be cancellable or terminable by lessee prior to the end of the term except as expressly provided herein."

The agreement provided that: "Lessor shall at all times retain title to the equipment..."

In the event of a default the lessor had the right to:

(a) Retake immediate possession of the equipment... lessor may, at its option, sell the equipment at public or private sale for cash or on credit and may become the purchaser at such sale. Lessee shall then be liable for the unpaid rent then due, the expense of retaking possession, and the removal of the equipment, storage, repair, court costs, attorney's fees and the balance of rentals provided for herein plus six percent (6%) of the original cost of the equipment less the net proceeds of the sale of the equipment, if any, after deducting all costs of sale; or,

(b) Accelerate the balance of rentals payable hereunder, thereby requiring prepayment of this lease....

The agreement contained a separate page entitled End-of-Lease options which provided:

At the expiration of the lease term, lessee agrees to exercise one of the following end-of-lease options:

☒ 1. Lessee shall purchase the above equipment for the consideration of ___2,700.00___.

☐ 2. Lessee shall continue to lease above equipment for monthly lease payments equal to _____ of original monthly rental.

Executed this 27 day of July, 1978

The End-of-Lease option was signed by Eastern Leasing Corp. and by the Debtor on July 27, 1978 and an X was placed in the box beside option # 1.

At the trial an expert testified for Eastern Leasing that the useful life of the refrigeration equipment was approximately seven (7) years (the term of the lease) and that the fair market value of the equipment

---

1. The landlord claims the same property as fixtures attached to its realty and the Debtors claim it under their Section 522(d)(5) exemption. Because of the various disputed claims to the property the Trustee was ordered to sell it free and clear of liens or other interests pursuant to Section 363(f)(4) of the Code, with valid and perfected liens and other interests to attach to the proceeds from the sale.

2. The agreement also contained the usual provisions found in net leases regarding insurance, risk of loss, maintenance, warranty disclaimers, etc. Those provisions, in this Court's view, are not pertinent here.

at the end of the lease period was between $2,000 and $2,200.[3]

### –DISCUSSION–

Maine's version of section 1–201(37) of the Uniform Commercial Code [11 M.R.S.A. § 1–201(37)] provides, as pertinent:

'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 2–401) is limited in effect to a reservation of a 'security interest'. . . Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest'. . . Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Section 9–102 provides that Article 9 applies to security interests created by leases intended as security.

█ It is well settled that "intended as security" as used in both sections 1–201(37) and 9–102 has little to do with the subjective intent of the parties. 1 Gilmore, *Security Interests In Personal Property*, § 11.2; Code Comment to section 9–102. The necessary intent, or lack of intent, should be determined from the effect of the parties' actions. 1 Bender's UCC Service, *Secured Transactions Under the UCC*, Coogan, *Leases of Equipment and Other Unconventional Security Devices*, Section 4A–06[10][c].

█ At the trial and in their briefs both parties assumed that the agreement executed by the parties contained an option to purchase. Eastern Leasing, of course, took the position that the option price approximated the fair market value of the equipment at the time of the exercise of the option and is not "nominal consideration" within the meaning of UCC § 1–201(37).

The Trustee, on the other hand, argued that the option price is "nominal consideration" and argues that the Court find that the lease was intended for security.

A careful reading of the agreement, however, reveals that there was no "option" to be exercised by the Debtor at the end of the term. The "option", if it was such, was exercised at the time of execution of the lease agreement.

The agreement, read in its entirety, as executed by the parties on July 27, 1978, required the Debtor to purchase the equipment for its full purchase price, plus sales tax, plus interest, plus $2,700. He made a down payment, designated in the agreement as an "advance payment" of $4,557.25. He was bound to pay the balance, plus interest and sales tax, at the rate of $911.45 per month, designated as "rental." At the end of the term, 84 months (seven years), he was bound to "purchase the above equipment for the consideration of $2,700.00."

The agreement provided: "This lease shall not be cancellable or terminable by lessee prior to the end of the term except as expressly provided herein." The agreement contains no exception to this prohibition against cancellation.

Looking at the agreement from the "lessor's" viewpoint, all it retained was title, ("Lessor shall at all times retain title to the equipment. . . ."); it parted with all other incidents of ownership, such as the right to a return of the equipment at the end of the term.

This obligation to return the leased item to the lessor at the end of the term is the distinguishing characteristic of a lease, . . . . 1 Bender's UCC Service, Coogan, *Secured Transactions Under The UCC*, § 4A.01[1].

---

**3.** The Debtor, who was experienced in the grocery business, testified that in his opinion the useful life of such equipment is ten to twelve years and that for this reason he would opt (and did opt) to purchase the equipment for $2,700 at the end of the term.

Cast in the language of UCC § 1–201(37), which defines a "security interest," the lease provided Eastern Leasing with "an interest (TITLE) in personal property... which secures payment or performance of an obligation" (by the lessee). The lessee, "upon compliance with the terms of the lease, becomes the owner of the equipment for no additional consideration."

Section 1–201(37) tells us that the retention or reservation of title in such case is limited in effect to a reservation of a "security interest" and that a lease such as the one we have under consideration here is a lease "intended for security."

> An agreement called a lease has been uniformly held to be a conditional sales contract where the so-called rental payments equalled the selling price, and upon the completion of all such payments the so-called lessee would become the owner of the chattel. *In re* Oak Manufacturing, Inc., 6 UCC Rep. 1273 (S.D.N.Y.1969). *See also In re* Gehorke Enterprises, Inc., 28 UCC Rep. 794 (B.C.Wis.1979); *Pierce v. Leasing International, Inc.,* 22 UCC Rep. 269 (Ga.App.1977); 1 Bender's UCC Service, ch. 4A; 1C Bender's UCC Service, ch. 29A.

Eastern Leasing's security interest, not having been perfected by filing as required by UCC Section 9–302 or as permitted by UCC Section 9–408,[4] is subordinate to the rights of the Trustee in Bankruptcy. *See* UCC Section 9–301 and 11 U.S.C. § 544.

An appropriate order will be entered.

---

**4.** 11 M.R.S.A. § 9–408 became effective in Maine on March 31, 1978. It provides that a lessor or consignor may file a financing statement.