In re COORS OF THE CUMBERLAND, INC., d/b/a Cumberland Beverage Company, Debtor.

COBLE SYSTEMS, INC., d/b/a Leaseco, d/b/a Leaseco Truck Rental, Plaintiff,

v.

COORS OF THE CUMBERLAND, INC., d/b/a Cumberland Beverage Company, Debtor.

Bankruptcy No. 381–03953.
Adv. No. 382–0029.

United States Bankruptcy Court,
M. D. Tennessee.

April 2, 1982.

Russell H. Hippe, Jr., Nashville, Tenn., for debtor/defendant.

G. Rhea Bucy, Daniel R. Loftus, Nashville, Tenn., for plaintiff.

## MEMORANDUM

GEORGE C. PAINE, II, Bankruptcy Judge.

This matter is before the court on the plaintiff Coble Systems' (hereinafter "Coble") complaint against the defendant Coors of the Cumberland (hereinafter "Coors") for relief from the automatic stay imposed by 11 U.S.C. § 362. Coble also requests the court to set a specific time in which Coors may accept or reject certain leases pursuant to 11 U.S.C. § 365. A hearing on Coble's complaint was held on January 14, 1982. At the conclusion of this hearing, the court took Coble's complaint under advisement. The automatic stay was continued by order of this court on March 19, 1982. Upon consideration of the proof presented at the hearing, stipulations, exhibits, briefs of the parties and the entire record, this court finds that Coble's complaint for relief from the stay should be denied. The court further finds that Coble's request that Coors assume or reject certain leases within a specific time should be denied since the instruments in question are not leases but are in substance installment sales contracts.

The following shall constitute findings of fact and conclusions of law pursuant to

* (Appendixes not published.—Editor)

Rule 752 of the Federal Rules of Bankruptcy Procedure.

Coors filed a Chapter 11 petition in this court on December 16, 1981. Coors is the Middle Tennessee distributor of Coors brand beer. The company commenced business approximately one year ago and, at this time, acquired a fleet of delivery trucks and other vehicles from Coble. The vehicles delivered to Coors included 32 trucks (26 tractors and 6 "straight" trucks with refrigerated bodies), 26 refrigerated trailer units, and 20 automobiles and pickup trucks.

Coors and Coble executed three separate and distinct types of instruments to delineate the terms of this transfer. The "Truck Lease and Service Agreement" entered into on December 2, 1980, (See Appendix A) * covered the 32 trucks and the "Master Lease" entered into on February 17, 1981, (See Appendix B) * covered the 26 refrigerated trailers. Both contracts required Coors to make monthly payments to Coble for the use of the vehicles. In addition, the "Truck Lease and Service Agreement" provided that Coors would pay Coble a varying mileage charge in return for certain maintenance services to be performed by Coble.

The 20 automobiles and pickup trucks were each covered by separate "Lease and Disclosure Statements" but in each case the same form was used and the pertinent provisions of each instrument are identical. Each instrument was checked as an "open end lease" and provided for monthly payments over a 24 or 36 month term. At the end of the term, Coors was required to return the vehicles to Coble who would then sell the vehicles. Each instrument contained an estimate of the "residual value" of each vehicle at the end of the lease term. If the sale of the vehicle brought more than this "residual value," then Coors would receive the gain but if the sale of the vehicle brought less than the estimated "residual value," then Coors would be liable to Coble for the deficiency. Both parties stipulated that these instruments were installment sales contracts rather than leases.

At the hearing on February 18, 1982, William Pendry, Executive Vice-President of Coble, testified that both the "Master Lease" and the "Truck Lease and Service Agreement" were intended to be "true leases" with Coors obtaining no interest in any of the vehicles covered by these instruments. Pendry further testified that the rate of depreciation for these vehicles as reflected in both instruments was based on straight line depreciation and did not accurately portray the actual depreciation of the vehicles, which was much greater than the depreciation amount listed in the two instruments. Pendry stated that Coble had leased the 26 trailers listed in the "Master Lease" from ITT Industrial Credit and Security Pacific and was currently paying $15,700.00 per month for the continued use of these vehicles. Coble borrowed funds to purchase each of the 32 trucks listed in the "Truck Lease and Service Agreement" and is currently paying $28,837.00 per month in principal and interest to these lenders. Pendry estimated that it cost Coble approximately $11,000.00 per month to maintain and service these 32 trucks as required by the "Truck Lease and Service Agreement." Pendry further testified that the 20 automobiles and pickups transferred to Coors would depreciate at a rate of 33% in the first year and 20% in the second year of their useful life.

In opposition to Coble's complaint, the debtor-in-possession presented the testimony of three witnesses. John Nichols, Chairman of the Board and the majority shareholder of Coors, testified that Coors was involved in ongoing negotiations with 25 to 30 different individuals to rehabilitate the debtor-in-possession. Nichols felt that an agreement would be completed in the near future which would put sufficient funds into the debtor-in-possession to pay off all existing debts. Nichols further testified that the low months in beer sales were January and February and that beer sales would begin to increase by March of 1982. Nichols estimated that by April 1st of 1982, the Coors' business would increase by 10% to 15%.

Jerry Hildebrand, Vice-President and Secretary/Treasurer of Coors, testified that Coors had taken several initial steps to reduce the company's expenditures. Coors had released 17 people from employment, all employees had taken a voluntary 10% pay cut, and the two major shareholders had reduced their salaries by 50%. Hildebrand further testified that the debtor-in-possession could continue to pay any charges by Coble for maintenance and service to the vehicles and that Coors would have an insurance binder in effect to cover all these vehicles by March 1, 1982. Hildebrand estimated that the March gross sales for Coors would be $800,000.00 and that these gross sales would increase to 1.1 million dollars by the end of April, 1982. Hildebrand also testified that the motor vehicles and refrigerated trailers in issue were necessary for the debtor-in-possession's reorganization. Coors presently used 29 of the trucks four days a week for five to six hours and on the fifth day, they utilized 26 of the trucks for about five to six hours. Hildebrand stated that although Coors could return the 20 cars and pickups to Coble, the debtor-in-possession would have to obtain replacements for these vehicles.

Robert C. Benson, President of Mid-America Beverage Bodies, Inc., of Ames, Iowa, testified that the wholesale value of the 32 trucks and 26 trailers transferred from Coble to Coors was approximately $1,000,000.00, this value being considerably less than the original cost of the trucks to Coble. Benson further testified that the value of these trucks and trailers would not decline over the next six months.

This matter is now before the court for final resolution.

To determine whether Coble is entitled to relief from the stay, the court must initially ascertain what interest Coble possesses in the property in question. The nature of Coble's interest depends upon whether the instruments executed between Coble and Coors constitute leases intended for security or "true leases."

The conditional sale-lease cases raise complex issues which have plagued the courts

for many years. *See generally* J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 22–3, at 877–883 (2d ed. 1980); Annot. 76 A.L. R.3d 11 (1977); Coogan, "Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9," 1973 DUKE L.J. 909 (1973); 1 Gilmore, *Security Interests in Personal Property* § 3.6, at 75–81 (1965). The frequent recurrence of this question is due in great part to the existence of strong incentives which induce a party to cast a financing arrangement in the form of a lease rather than an installment sales contract. As the court observed in *Woco v. Benjamin Franklin Corp.*, 20 U.C.C.Rep.Serv. 1015, 1019 (D.N.H.1976):

"Because of the difference in tax treatment between a lease and an installment sale with an accompanying security agreement, the "lease" has become a popular financing arrangement. The debtor-taxpayer, under a security agreement, may deduct from his gross income only that part of the payments which reflect interest. 26 U.S.C. § 163. Under a lease agreement, the lessee taxpayer can deduct the entire amount of lease payments. 26 U.S.C. § 162(a)(3). Deductions for depreciation are taken by the lessor under a lease, but by the purchaser in an installment sale transaction. 26 U.S.C. § 167(a). The investment tax credit may be taken by either the lessee or the lessor in a lease arrangement, 26 C.F.R. § 1.48(d); but only by the purchaser in an installment sales transaction, 26 C.F.R. §§ 1.46–1–1.48–7."

A party may also be encouraged to cast an installment sales contract in the form of a lease in order to avoid complying with the Uniform Commercial Code filing and default provisions or to avoid a local tax or local regulation that applies to owners but not lessees. J. White and R. Summers, *supra* § 22–3, at 878.

■ The determination of whether the financing arrangements in this case are installment sales contracts or true leases is governed by § 47–1–201(37) of the Tennessee Code, which provides in pertinent part:

"... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

The terms of the financing arrangement rather than the subjective intent of the parties determine whether the lease is one intended for security. *Eastern Leasing Corp. v. Pye*, 13 B.R. 307, 309 (Bkrtcy.D.Me. 1981); *In re Peacock*, 6 B.R. 922, 924 (Bkrtcy.N.D.Tex.1980); *Chandler Leasing Corp. v. Samoset Associates*, 24 U.C.C.Rep. Serv. 510, 512–513 (D.Me.1978) (B.J.). *See also* 1 Gilmore, *supra* § 11.2, at 338.[1] A party cannot avoid the legal consequences of an installment sales contract by simply labeling a financing arrangement as a lease.

■ The decisive factor in distinguishing a lease intended for security from a true lease is whether the instrument in question will ultimately result in the purported lessee gaining *de facto* ownership of the subject matter of the lease. As the Tennessee Supreme Court recently explained in *United States Fidelity and Guaranty Co. v. Thompson and Green Machinery Co.*, 568 S.W.2d 821, 825 (Tenn.1978):

"Perhaps the most revealing test is whether the so-called lessee is obligated to accept and pay for the property or is obligated only to return or account for the property according to the terms of the lease from which he may be excused only if he exercises his privilege of purchasing it. If the latter is the case, the transaction is a true lease but if the contract, whatever its form, imposes an abso-

---

1. All cases cited in reference to § 47–1–201(37) of the Tennessee Code involve interpretation of statutory language which is identical to the language contained in § 47–1–201(37).

lute obligation to pay for and accept the property and the transferor may require its return only upon default of the transferee, the transaction is a conditional sale.

Of course, the intent of the parties is always controlling and is to be ascertained from the whole transaction, not merely from the language employed.

In close cases the courts consider whether the payments required of the transferee are in such amounts, spread over such a period of time, and are to be so made that compared with the original value of the property, its depreciation and likely value at the end of the term, that they may be reasonably considered as compensation *for the use* of the property or, instead, as payments on an absolute obligation *for the purchase price*, as in a conditional sale." (Citations omitted).

*See also In re Winston Mills, Inc.*, 6 B.R. 587, 596–599 (Bkrtcy.S.D.N.Y.1980) (construing Tennessee law); *Story Brothers, Inc. v. Beard (In re Jim Wilson, Inc.)*, 17 U.C.C.Rep.Serv. 1104, 1105–1107 (E.D.Tenn. 1975) (B.J.); *In re Polaris Industries, Inc.*, 14 U.C.C.Rep.Serv. 182, 185 (E.D.Tenn.1973) (B.J.).

■ After an extensive examination of the terms of each of the instruments in this case, the court has concluded that all of these financing arrangements are leases intended for security rather than true leases. The parties themselves have stipulated that the individual leases covering the 20 cars and pickup trucks are installment sales contracts.[2] The remaining two financing arrangements, although divergent in terminology, also constitute leases intended for security.

The "Truck Lease and Service Agreement" provides for monthly rental payments to Coble by Coors for the use of 32 trucks. The "Truck Lease and Service Agreement" contains no expiration date, and apparently continues until terminated

by either Coble or Coors. Section V.A. of the agreement defines each party's "Termination Privileges" as follows:

"A. Either party may cancel this agreement by giving to the other party written notice of intent to do so, at least sixty (60) days prior to the first and any subsequent anniversary date (Date of Delivery as per Schedule A) as established by the provisions of 'I. PROPERTY COVERED AND TERMS'. In such event LESSEE shall purchase for cash all vehicles then being leased under this agreement as described in 'Schedule A,' for the sum of the 'original value' less the total depreciation which has accrued for each vehicle as set forth in 'Schedule A' plus any unexpired licenses, prepaid interest, and applicable taxes; except, however, that the minimum purchase price at any time shall not be less than twenty-five (25%) percent of the 'original value' of each vehicle as set out in 'Schedule A.' "

This provision specifically provides that Coors *shall purchase* the 32 trucks when the agreement is terminated. This language is absolute and leaves Coors with no choice but to purchase these vehicles upon termination of the agreement. At some point, the economic realities of this situation will force Coors to terminate the "lease" and purchase these vehicles at the amount stipulated to in the agreement. Otherwise, Coors would continue to pay rent indefinitely on vehicles which are depreciating in value and will ultimately become useless.

Under the terms of this instrument, Coble has effectively parted with the right to a return of the equipment at the end of the lease term. The lessee's obligation to return the leased property to the lessor is the distinguishing characteristic of a true lease. Since this obligation is not present in the "Truck Lease and Service Agreement," then this agreement must be construed as an installment sales contract rather than a true lease. *Eastern Leasing Corp. v. Pye,*

---

**2.** Even if the parties had not stipulated to this fact, the court would have found that these 20 individual "leases" were installment sales contracts. *See Adelman v. General Motors Acceptance Corp. (In re Tulsa Port Warehouse Co.),* 4 B.R. at 805.

13 B.R. at 309–310; *Livesey Enterprises v. Smith Management, Inc.*, 8 B.R. 346, 348 (Bkrtcy.W.D.Wis.1980); *In re Peacock*, 6 B.R. at 925; *Adelman v. General Motors Acceptance Corp. (In re Tulsa Port Warehouse Co.)*, 4 B.R. 801, 805–806 (Bkrtcy.N.D. Okla.1980). *See also Steele v. Gebetsberger (In the Matter of Fashion Optical, Ltd.)*, 653 F.2d 1385, 1389 (10th Cir. 1981); *Litton Industries Credit Corp. v. Dunn Brothers, Inc.*, 16 B.R. 42, 45–46 (Bkrtcy.W.D.Va. 1981); *In re Pacific Sunwest Printing*, 6 B.R. 408, 412 (Bkrtcy.S.D.Cal.1980); *In re Winston Mills, Inc.*, 6 B.R. 587, 597 (Bkrtcy. S.D.N.Y.1980).

The second agreement between Coors and Coble, labeled the "Master Lease," provided for monthly rental payments to Coble by Coors for the use of 26 refrigerated trailers. The lease term was for ten years, with Coors having the option at the end of this period to either renew the lease for a term of at least twelve months for the then existing fair market rental value or to purchase the refrigerated trailers at the then existing fair market value. The agreement specifically stated that the depreciable life of each of the refrigerated trailers was ten years.

The determination of whether the "Master Lease" is a true lease or a lease intended for security depends upon whether the lessee has the option to purchase the refrigerated trailers at the end of the lease term for little or no additional consideration. Section 47–1–201(37) of the Tennessee Code specifically provides that an agreement is a lease intended for security if upon compliance with the terms of the lease the lessee has the option "to become the owner of the property for no additional consideration or for a nominal consideration." Generally, an option for the lessee to purchase the property at the end of the lease term for the then existing fair market value of the property creates an inference that the consideration to be paid by the lessee is not nominal. This inference may be rebutted, however, by proof that the fair market value of the property at the conclusion of the lease term

would be negligible. As one commentator explained:

"If the structure of the lease, comprising its minimum term multiplied by the periodic rental for that term, will enable the lessor to recover the present cash market value in full plus interest at an appropriate rate, the lessor may not need or intend ever to recover possession of the leased equipment once all rentals have been paid in full. However, absent a purchase option at a nominal figure, an intention to abandon its proprietary interest in leased equipment can not easily be imputed to the lessor. On the other hand, if there is added to the above facts a finding that the minimum term closely approximates the anticipated economic life of the equipment, the intention becomes fairly obvious."

Peden, "The Treatment of Equipment Leases as Security Agreements under the Uniform Commercial Code," 13 Wm. & Mary L.Rev. 110, 147–148 (1971) *quoted in Leasing Service Corp. v. American National Bank and Trust Co.*, 19 U.C.C.Rep.Serv. 252, 259–260 (D.N.J.1976). *See also National Equipment Rental, Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236, 239 (E.D.N. Y.1977); *Borg-Warner Acceptance Corp. v. Dugger (In re Teel)*, 9 B.R. 85, 88–89 (Bkrtcy.N.D.Tex.1981); *Chandler Leasing Corp. v. Samoset Associates*, 24 U.C.C.Rep. Serv. at 516–517; *In re Pomona Valley Inn*, 4 U.C.C.Rep.Serv. 893, 894 (C.D.Cal.1967) (B.J.).

An examination of the ultimate consequences of the "Master Lease" reveals that Coors had the option to purchase the 26 trailers for a nominal consideration at the end of the lease term. The "Master Lease" states that the original cost of the 26 refrigerated trailers was $980,419.34. The total rent to be paid by Coors during the ten year lease term was approximately $2,073,256.80, a figure which would include the original cost of the trailers plus interest. In addition, the "Master Lease" gave Coble the depreciation allowance and investment tax

credit for the 26 refrigerated trailers.[3] Finally, the lease term was to extend through the entire useful life of the refrigerated trailers. By definition, the fair market value of the trailers at the expiration of the lease term would be insubstantial. *See Borg-Warner Acceptance Corp. v. Dugger (In re Teel)*, 9 B.R. at 88–89. The court, therefore, concludes that the "Master Lease" was a lease intended for security as defined by § 47–1–201(37) of the Tennessee Code. Additional factors which buttress the finding that the "Master Lease" was a disguised installment sales contract include (1) the lessee Coors had to maintain the trailers at its own expenses, (2) the lessee had to bear the expense of insurance and the risk of loss and (3) the lessee was required to pay all taxes, assessments and licenses. *See Steele v. Gebetsberger (In the Matter of Fashion Optical, Ltd.)*, 653 F.2d at 1389.

Having found that the agreements between Coors and Coble are in fact leases intended for security, the court can now proceed to determine whether Coble is entitled to relief from the automatic stay imposed pursuant to 11 U.S.C. § 362.[4] Section 362(d) provides:

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) For cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) With respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization."

■ In seeking relief from the automatic stay, the creditor has the burden of proof on the issue of the debtor's equity in the collateral, with the debtor having the burden of proof on all other issues, including adequate protection of the creditor. 11 U.S.C. § 362(g).

■ The court will first address whether Coble is entitled to relief from the stay under 11 U.S.C. § 362(d)(2). In the present case, the debtor's lack of equity in the various vehicles and refrigerated trailers is not disputed. Williams Pendry, the Executive Vice-President of Coble, testified that the initial depreciation of value in this property far exceeded any payments which had been received by Coble from Coors. Coors did not contradict this testimony.

Coors did, however, present evidence to demonstrate that the debtor-in-possession had excellent potential for a successful reorganization. John Nichols, the Chairman of the Board and majority shareholder of Coors, testified that Coors was presently involved in negotiations with 25 to 30 individuals in an effort to rehabilitate the debtor-in-possession. Nichols felt that, if these negotiations were successful, Coors would obtain enough funds to pay off all its debts. Jerry Hildebrand, Vice-President and Secretary/Treasurer of Coors, estimated that the debtor-in-possession would have gross sales of $800,000.00 in March and that these gross sales would increase to 1.1 million dollars by the end of April.

Hildebrand also testified that the property in question was necessary to the debtor-in-possession's reorganization. Hildebrand stated that Coors employed 29 of the truck units four days a week for five to six hours a day and that, on the fifth day, Coors used 26 of the truck units for about five to six hours a day. Hildebrand further testified

---

**3.** The court does not consider, because not raised, the issue of whether any of these agreements are usurious and, if so, what impact that finding would have on these proceedings. *See generally Riverside Park Realty Co. v. Federal Deposit Insurance Corporation*, 465 F.Supp. 305, 311–312 (M.D.Tenn.1978); Annot., 94 A.L. R.3d 640 (1979).

**4.** Since the court has concluded that the agreements between Coble and Coors are essentially installment sales contracts rather than true leases, Coble's complaint to require Coors to accept or reject these "leases" must be denied.

that, if Coors were required to return the fleet of cars and pickup trucks acquired from Coble, the debtor-in-possession would have to obtain replacements for these vehicles.

Under these circumstances, the court finds that these vehicles and refrigerated trailers are necessary to the debtor-in-possession's effective reorganization. To require the return of this property at the present time might seriously undermine the debtor-in-possession's healthy prospects for a successful reorganization. Coble is not, therefore, entitled to relief from the stay under 11 U.S.C. § 362(d)(2).

Coble may, however, be entitled to relief from the stay pursuant to 11 U.S.C. § 362(d)(1) if its interest in property held by the debtor-in-possession is not adequately protected.[5] In order to resolve the issue of adequate protection, the court must first determine whether the agreements between Coors and Coble were properly perfected. If the leases are unperfected, then Coble has no interest in the property of the estate which is entitled to adequate protection since Coble's interest would be limited to that of a general unsecured creditor of the estate.

■ The method of perfection of these security interests is governed in part by the nature of the collateral. The 26 refrigerated trailers covered by the "Master Lease" are defined as equipment by § 47–9–109(2) of the Tennessee Code since they were bought primarily for use in a business. *See In re Regency Furniture, Inc.*, 7 U.C.C.Rep. Serv. 1384, 1386 (E.D.Tenn.1970) (B.J.). To perfect its security interest in this equipment, Coble was required to file a financing statement in the office of the Secretary of State. Tenn.Code Ann. § 47–9–401(1)(c). Since no proof was offered that Coble filed such a financing statement, the court concludes that Coble's security interest in the 26 trailers is unperfected and thus Coble is not entitled to adequate protection.

■ The remaining agreements between Coors and Coble create security interests in various motor vehicles. Each certificate of title in question shows Coble as the owner of the vehicle. The certificates of title do not contain a notation that Coble has a lien on the vehicles or that the vehicles have been leased to Coors.

The perfection of these agreements is governed by § 47–9–302 of the Tennessee Code.[6] Section 47–9–302 prescribes that the perfection of motor vehicles is to be accomplished in accordance with the provisions of § 55–3–126(b) of the Tennessee Code.[7] Pursuant to § 55–3–126(b), this court has consistently held that perfection of a security interest in a motor vehicle may be effectuated *only* by notation of the lien upon the vehicle's certificate of title. *Edmondson v. Williamson County Bank (In re King)*, Case No. 380–00247, Adv.Proc.No. 380–0308 (Bankr.Ct.M.D.Tenn., Dec. 17, 1980); *Edmondson v. Farmers & Merchants Bank (In re Phippen)*, Case No. 79–30899

---

5. The court does not accept the debtor-in-possession's contention that Coble has no interest in the refrigerated trailers since Coble originally "leased" these trailers from third parties. The agreement between Coble and Coors for the lease of these trailers constituted a lease intended for security and Coble is entitled to adequate protection to the extent that its security interest is impaired during the course of Coors' bankruptcy proceedings.

6. Section 47 9 302 of the Tennessee Code provides in pertinent part:
    "(3) The filing provisions of this chapter do not apply to a security interest in property subject to a statute:
    (a) . . .
    (b) of this state which provides for central filing of, or which requires indication on a

certificate of title of, such security interests in such property.
    (4) A security interest in property covered by a statute described in subsection (3) can be perfected only by registration or filing under that statute or by indication of the security interest on a certificate of title or a duplicate thereof by a public official."

7. Section 55–3–126(b) of the Tennessee Code provides in relevant part:
    ". . . It is the intent of this section that any mortgage, trust receipt or other similar instrument of indebtedness required by chapters 1–6 of this title shall be noted upon the certificate of title only and shall not be required to be made a public record elsewhere."

(Bankr.Ct.M.D.Tenn., Jan. 18, 1980). *See also In re Russell,* 300 F.Supp. 6, 7 (E.D. Tenn.1969); *In re Wallace,* 251 F.Supp. 581, 584 (E.D.Tenn.1966); *In re Crosson,* 226 F.Supp. 944, 946–947 (E.D.Tenn.1963); *Still v. Commerce Union Bank (In re Custom Caps, Inc.),* 1 B.R. 99, 102 (Bkrtcy.E.D.Tenn. 1979); *In re DEB Cabinet Corp.,* 16 U.C.C. Rep.Serv. 236 (E.D.Tenn.1974) (B.J.).

To apply this standard literally in the present case, however, would clearly work an inequitable result. The sole purpose of § 55–3–126(b) is to give notice that the secured party has an interest in the motor vehicle. *In re Vaughn,* 283 F.Supp. 730, 734 (M.D.Tenn.1968); *Personal Loan and Finance Corp. v. Guardian Discount Co.,* 206 Tenn. 221, 332 S.W.2d 504, 506 (1960). And, while § 55–3–126(b) outlines the procedure to be followed in perfecting a security interest in a motor vehicle, motor vehicles still fall within the purview of the Uniform Commercial Code as enacted by the State of Tennessee. *Manufacturers Acceptance Corp. v. Gibson,* 220 Tenn. 654, 422 S.W.2d 435, 436 (1967). The perfection provisions of the Uniform Commercial Code properly recognize that any filing "substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." Tenn.Code Ann. § 47–9–402(5).

The notation of Coble as owner rather than secured party on the certificate of titles would not be seriously misleading. Anyone diligently searching the certificate of title records would discover that Coble possessed an interest in these vehicles. Under these circumstances, the notation of Coble as owner of the vehicle on each certificate of title was sufficient to perfect Coble's security interests in these vehicles. *See In re Circus Time, Inc.,* 641 F.2d 39, 42–45 (1st Cir. 1981); *Jahn v. North American Van Lines (In re Trivett),* 12 B.R. 373, 382–386 (Bkrtcy.E.D.Tenn.1981) (construing Indiana law).

Since Coble's security interests in these vehicles were properly perfected, Coble is entitled to adequate protection of its interest in this property. Adequate protection is designed to preserve the secured creditor's position at the time of bankruptcy. 2 Collier on Bankruptcy ¶ 361.01, at 361–6 15th ed. 1981).

At the hearing of this matter, Jerry Hildebrand, Vice-President and Secretary/Treasurer of Coors, testified that the debtor-in-possession could continue to pay for the maintenance of these vehicles and would obtain insurance on these vehicles by March 1st of 1981. The court finds that both of these steps are necessary in order to provide Coble with adequate protection. At the time this bankruptcy petition was filed, Coble was providing maintenance services to Coors as a part of the "Truck Lease and Service Agreement." William Pendry, Executive Vice-President of Coble, testified that the value of this maintenance service was approximately $11,000.00, consisting of $7,000.00 for actual services and $4,000.00 for overhead cost. Since Coors has not presented any evidence that it could maintain the vehicles in question elsewhere at a lower cost, the court concludes that this maintenance expense of $11,000.00 per month should be paid by Coors to Coble.

In addition, Coble is entitled to any depreciation in the value of these motor vehicles during the course of these proceedings. Robert Benson, President of Mid-America Beverage, testified that the value of the trucks covered by the "Truck Lease and Service Agreement" would not depreciate over the next six months. This testimony was uncontradicted[8] and therefore the court concludes that, since the value of the collateral will not depreciate over the next six months, Coble's interest in this property is adequately protected at this time. *See Provident Bank v. BBT,* 11 B.R. 224, 231–232 (Bkrtcy.D.Nev.1981). As for the 20 cars and pickups acquired by Coors from Coble,

---

**8.** Although the "Truck Lease and Service Agreement" contains a depreciation schedule which reflects that the 32 trucks are subject to straight-line depreciation, the proof presented demonstrated that this depreciation table did not reflect the actual depreciation of these vehicles.

William Pendry testified that the value of these vehicles would depreciate by 33% in their first year of use and by 20% in their second year of use. Since Coors did not dispute this testimony, the court concludes that Coble is entitled to monthly payments reflecting the actual depreciation of these cars and pickup trucks.

Accordingly, an order will be entered denying the plaintiff Coble's petition for relief from the stay. The court will further order that Coors pay to Coble $11,000.00 per month for the maintenance services described in the "Truck Lease and Service Agreement" and that Coors maintain the 20 cars and pickup trucks in good condition. Coors will also be required to keep all of these motor vehicles insured. Furthermore, to compensate Coble for the depreciation of the 20 cars and pickup trucks, Coors must pay to Coble a monthly payment equal to the actual depreciation of these vehicles, which is currently 20% of the original cost. Finally, since this court has concluded that the agreements in question are installment sales contracts rather than true leases, an order will be entered denying Coble's complaint to require Coors to accept or reject these "leases" within a specified time.

IT IS THEREFORE SO ORDERED.