**HANNAFORD BROS., CO., et al.**

v.

**STATE TAX ASSESSOR.**

Supreme Judicial Court of Maine.

Argued Nov. 13, 1984.

Decided Jan. 30, 1985.

**252** ■　■■■■■■■■■■■■■■■■

Verrill & Dana, Michael T. Healy (orally), Portland, for Hannaford Bros. Co.

Murray, Plumb & Murray, Peter L. Murray (orally), Portland, for Hutchins Trucking Co.

Lendall L. Smith, Asst. Atty. Gen. (orally), Augusta, for defendants.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and SCOLNIK, JJ.

SCOLNIK, Justice.

This case presents another example of the recurring problem of defining a transaction as a lease or a sale. In this case the State Tax Assessor has assessed a tax on the use of certain vehicles that Hannaford Bros., Co. acquired from the Hertz Corporation. Hannaford argues that the transaction avoids that tax. If the transaction was a sale, Hannaford's subsequent use of the vehicles was properly taxed under 36 M.R.S.A. § 1861 (1978).[1] If, on the other hand, it was a lease, then the assessment was improper. Despite the parties' best efforts to label the transaction a "lease" at every possible point, we hold that in reality it constitutes a sale. We thus affirm the Superior Court's judgment for the Assessor.

## I.

Hannaford, a distributor of groceries, leased a fleet of trucks and trailers from Hertz in 1973. That contract, called a "Truck Lease Service Agreement," was designed to provide Hannaford with a dependable source of transportation for its business without the burden of maintaining the vehicles in serviceable condition. Under the agreement Hertz bore the responsibility for fueling, maintaining, and repairing the vehicles. It also agreed to replace or substitute trucks and trailers when necessary to maintain the number of vehicles Hannaford needed at all times.

This agreement was renewed periodically over the next six years. In 1976 Hannaford, with Hertz's permission, subleased certain vehicles to the Hutchins Trucking Co., intervenor in this action. Hutchins continued to use them under the terms of the original Truck Lease Service Agreement.

The quality of Hertz's maintenance of the vehicles deteriorated, and Hannaford's dissatisfaction increased, to the point where the parties agreed to terminate the 1973 contract and to enter a new one. This was accomplished by means of a letter agreement of October 10, 1979, incorporating a new Truck Lease Service Agreement dated November 3, 1979. Both became effective on November 3. The immediate consequence of the new arrangement was to relieve Hertz of its responsibility for servicing the vehicles.

By the October 10, 1979, letter agreement the parties also agreed that the new contract would terminate on February 29, 1980, at which point Hannaford would purchase, or would cause a third party to purchase, the vehicles covered by the contract. Hannaford agreed to pay a total of

---

1. 36 M.R.S.A. § 1861: "A tax is imposed on the storage, use or other consumption in this State of tangible personal property, purchased at retail sale, at the rate of 5% of the sale price...."

$174,400 in "rent" between November 1, 1979, and February 1, 1980. The purchase price would be the depreciated value of the vehicles (determined by a "weekly depreciation credit" formula originally agreed on in 1973) less a sum agreed on in settlement of other disputes. Ultimately Hannaford and its appointees paid Hertz $1,477,688.32 on February 25, 1980. Hutchins was one of the appointees, taking title to the vehicles it had been leasing. It intervened in this action in Superior Court because it is liable to Hannaford for any use tax imposed on those vehicles.

Besides calling for a specific termination date, the October/November, 1979, contract ended the substitution feature of the original lease. As of November 3, 1979, Hannaford possessed certain specific vehicles which it was obligated to purchase in an "As Is, Where Is" condition on February 29, 1980. Title was stated to remain in Hertz until that date.

The new contract reaffirmed three significant features of the 1973 lease. Hannaford bore "the entire risk of direct and/or consequential loss or damage to the vehicles ... from any and every cause whatsoever...." Hannaford also bore "any and all liabilities to third parties ... arising out of ownership, use, leasing, maintenance, and/or operation of the said vehicles." Finally, Hannaford was obligated to pay Hertz immediately the depreciated value of any vehicle lost or destroyed, or the depreciated value of all the vehicles upon the happening of any of the various events of default before February 29, 1980.[2]

This contract provided alternatives to Hannaford's purchase by payment in full upon default. Hertz could have repossessed and sold the vehicles, charging any deficiency under the depreciated value to Hannaford, or applying any surplus to Hannaford's account. Hertz could also have kept any vehicle, charging Hannaford with the difference between the depreciated value and the appraised market value, or crediting Hannaford with any surplus as above. In any event, Hertz was guaranteed the full depreciated value sooner or later, while receiving "rent" in the meantime.

The Assessor determined that the new contract was, in effect, a retail sale of the vehicle with Hertz retaining title only for security. He relied on the definitions of "retail sale" and "sale" in 36 M.R.S.A. § 1752(11) and (13) (1978), which apply to § 1861, the use tax.[3] More particularly, he relied on the second and third sentences of Bureau of Taxation Rule 316.02, promulgated under the responsibility given him by 36 M.R.S.A. § 1752(13) to determine when a lease is "in lieu of purchase."[4]

---

2. "Default" was defined to include any one of: Hannaford's nonpayment, breach of a "covenant," insolvency, bankruptcy, or assignment for the benefit of creditors, material change in financial condition, or misrepresentation in the contract.

3. 36 M.R.S.A. § 1752 (1978):

(11) "Retail sale" or "sale at retail" means any sale of tangible personal property, in the ordinary course of business, for consumption or use .... [It] includes conditional sales, installment lease sales, and any other transfer of tangible personal property when the title is retained as security for the payment of the purchase price and is intended to be transferred later....

[Hannaford does not dispute the Assessor's determination that, because of Hertz's frequent involvement in such transactions, if this was a sale it was "at retail."]

(13) "Sale" means any transfer, exchange or barter, in any manner or by any means whatsoever, for a consideration in the regular course of business and includes leases and contracts payable by rentals or license fees for the right of possession and use, but only when such leases and contracts are deemed to be in lieu of purchase by the State Tax Assessor.

4. Rule 316.02:

If tangible personal property is, for all intents and purposes, sold but the transaction is designated as a lease or rental for the purpose of retaining title in the seller and as security for payment of the purchase price, or for the purpose of avoiding sales tax, the rental will be deemed to be in lieu of purchase, and total rental payments charged will be considered to constitute the sale price upon which tax is due. A lease shall be deemed "in lieu of

## II.

The great majority of "sale or lease" cases have arisen under the Uniform Commercial Code. The Article 9 consequences of finding a contract to be a secured transaction rather than a lease—public filing, priority, the available remedies—are quite different from the tax consequences under 36 M.R.S.A. § 1861: tax on the subsequent use of the property. However, the Legislature has defined the event triggering taxation, a "retail sale," in language which indicates that the same analysis is required. Construing the U.C.C. and the commercial tax statutes as complementary promotes consistency in commercial planning and ensures that the development of commercial practices are not hindered by "traps based upon formal technicalities resulting from the piece-meal development of the law." 11 M.R.S.A. § 9–101, Maine Code Comment. It is thus appropriate to rely on the same considerations to distinguish between a lease and a secured purchase under the use tax statute as under the Uniform Commercial Code.

36 M.R.S.A. § 1752(11) includes in the definition of "retail sale," "conditional sales, installment lease sales, and any other transfer of personal property when the title is retained as security for the payment of the purchase price and is intended to be transferred later." Because of the steadily increasing variety of leasing transactions, no single test will determine for every contract whether title has been retained as security. The U.C.C. analysis looks first to the definition of "security interest" in (11 M.R.S.A.) § 1–201(37). That states, in part,

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.... Unless a lease or consignment is intended as security, reservation

of title thereunder is not a "security interest".... Whether a lease is intended as security is to be determined by the facts of each case; however (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Whether a lease is "intended as security" is not a matter of the parties' subjective intent, but rather of the objective effects of the transaction. *In re Pye*, 13 B.R. 307, 309 (Bkrtcy.D.Me.1981); 1 Gilmore, *Security Interests in Personal Property*, § 11.2 at p. 338 (1965). *See Trimount Coin Machine Co. v. Johnson*, 152 Me. 109, 113, 124 A.2d 753, 755 (1956): "The so-called lease is not *in legal effect* a lease, it is a contract of purchase." (quoting from an earlier case; emphasis added). *Trimount* seems to be this court's most recent previous treatment of the lease/sale issue under the use tax statute.[5]

It is apparent that the October/November, 1979, transaction between Hannaford and Hertz falls within the rule of 11 M.R.S.A. § 1–201(37) clause (b). Hannaford was obligated to purchase the vehicles by the terms of the "lease," whether upon loss, default, or termination. The objective effect of the contract, taken as a whole, was that, "upon compliance with the terms of the lease [Hannaford would] become ... the owner of the property for no additional consideration...." In such a case, "the message of 11 M.R.S.A. 1–201(37)(b)" is that the "lease shall be conclusively presumed to have been intended for security...." *In re Vaillancourt*, 7 U.C.C.Rep.

purchase" when once the lessee enters into the so-called lease agreement, he must acquire title to the tangible personal property under the terms of the agreement. Tax in such cases is due at the time the transaction is entered into, except where total rental pay-

ments are not determinable in advance, in which case tax is due as rental payments accrue.

5. At that time codified at R.S. ch. 17, §§ 2 and 4 (1954).

748, 761 and n. 31 (Bkrtcy.D.Me.1970) (Cyr, J.). *See In re Pye*, 13 B.R. at 310. Hertz, then, only retained title as security, and the October/November, 1979, transaction was a "sale" within 36 M.R.S.A. §§ 1752(11) and 1861.

■ It is also apparent that Bureau of Taxation Rule 316.02, second sentence, reaches the same result. That is, "[a] lease shall be deemed to be 'in lieu of purchase' when once the lessee enters into the so-called lease agreement, he must acquire title to the tangible personal property under the terms of the agreement." This rule is consistent with our interpretation of 36 M.R.S.A. § 1752(11), and is, therefore, a proper test for determining whether a "lease" is actually a "sale" within the meaning of 36 M.R.S.A. § 1861. Hannaford's option to appoint a third party to take title at the end of the contract term does not require a different result. The ultimate obligation was on Hannaford.

As noted above, no single test will determine the "true character" of every contract. Probably the most effective is to examine what residual interest the "lessor" retains at the end of the contract term. *See* 1 Coogan, Hogan & Vagts, *Secured Transactions Under the Uniform Commercial Code*, § 4A.07 at p. 4A–177 (1984). 11 M.R.S.A. § 1–201(37), clause (b), and Rule 316.02 declare that where the "lessor" retains no interest, there is a secured transaction. Indeed, this is the approach adopted by the prior Maine case law. In *Trimount Coin Machine Co. v. Johnson* we said,

> [t]o lease property in ordinary meaning is to obtain the use and possession of property in return for rent.... Under a bona fide lease it is contemplated that use for a limited time by the lessee will be followed by a return of the property to the lessor. In a conditional sale ... the end is ultimate ownership by the buyer.

152 Me. at 113, 124 A.2d at 755–56. *Accord Gorham v. Holden*, 79 Me. 317, 9 A. 894 (1887); *In re Pye*, 13 B.R. at 309 ("This obligation to return the leased item to the lessor at the end of the term is the distinguishing characteristic of a lease.")

■ Other jurisdictions have also held that the absence of a meaningful residual interest in the "lessor" is a significant indicium of a secured transaction. *E.g. In re Clemmons*, 37 B.R. 712 (Bkrtcy.W.D.Mo. 1984); *In re Peacock*, 6 B.R. 922 (Bkrtcy.N. D.Tex.1980); *Transamerica Leasing Corp. v. Bureau of Revenue*, 80 N.M. 48, 450 P.2d 934 (1969). An option to purchase for a nominal sum indicates that the "lessor" has retained no substantial residual interest. 11 M.R.S.A. § 1–201(37). Where, as here, a lessee has not just an option, but an unavoidable obligation to purchase the property at the end of the "lease" term, the conclusion is required that it is a secured transaction. *In re Medical Oxygen Service, Inc.*, 36 B.R. 341 (Bkrtcy.N.D.Ga. 1984).

### III.

■ Hannaford argues, however, that this was a "true lease" *pending* purchase; in effect, that there were two separate transactions. Assuming, arguendo, that the parties could have entered a lease pending a pre-arranged purchase, that is not the case here where Hertz parted with all incidents of ownership from the beginning.

Most significant, in our view, is that Hannaford bore the economic burden, or would receive the gain, upon disposition of the vehicles whenever and however that occurred. Hannaford's obligation to pay Hertz the full purchase price of the vehicles did not necessarily await February 29, 1980, but could have accrued on November 4, 1979, if the vehicles had been destroyed or if Hannaford had defaulted. Payment of the price was only deferred during the "lease" term so long as there was no loss or default.

The contract provided alternatives to Hannaford's outright purchase in such an event. Hertz could have sold the vehicles, charging any deficiency under the agreed

purchase price to Hannaford or crediting it with any surplus. Hertz could also have kept any vehicle, crediting Hannaford with its fair market value. In any event, Hannaford's equity in the vehicles was clearly recognized. *See In re Tulsa Port Warehouse Co., Inc.,* 690 F.2d 809 (10th Cir. 1982); *Matter of Tillery,* 571 F.2d 1361 (5th Cir.1978); *In re McNutt,* 37 B.R. 95 (Bkrtcy.D.Ore.1984); *Rainier Nat. Bank v. Inland Machinery Co.,* 29 Wash.App. 725, 631 P.2d 389 (1981).

There were also other indicia of ownership here. Hannaford assumed all liabilities to third parties "arising out of ownership, use, leasing, maintenance and/or operation of the said vehicles." *See Matter of Tillery,* 571 F.2d at 1366. Hannaford was obligated to insure the vehicles, "covering both Hertz and [Hannaford] and their respective agents and employees as insureds...." *See Tulsa Port Warehouse,* 690 F.2d at 811. The contract excluded all warranties running from Hertz to Hannaford. *See Matter of Anton's Lounge & Rest., Inc.,* 40 B.R. 134, 136 (Bkrtcy.E.D. Mich.1984). A countervailing factor was Hertz's agreement to pay the vehicle registration fees and taxes. *See Tulsa Port Warehouse,* 690 F.2d at 811; *Matter of Tillery,* 571 F.2d at 1366.

The liability, insurance, warranty, and tax factors are, of course, matters of contract negotiation, and any one may rest with either party to a bona fide lease. But "whether a lease is intended as security is to be determined by the facts of each case." 11 M.R.S.A. § 1–201(37). Here, the aggregate of these factors and the clear recognition of Hannaford's equity position in the provisions for loss, default, or termination make inescapable the conclusion that this transaction was a sale from the beginning.

Because Hannaford purchased the vehicles on November 3, 1979, deferring only full payment, its argument that the tax is improper as to the vehicles ultimately purchased by Hutchins is unavailing. That title to those vehicles was never in Hanna-

ford is irrelevant since Hertz only retained title for security after November 3, 1979. Hannaford's equity, as discussed above, was in all the vehicles after that date.

The entry is:

Judgment affirmed.

All concurring.