15-1771; 15-1682; 15-1824
*In re MPM Silicones, LLC*

# In the
# United States Court of Appeals
## For the Second Circuit

————

August Term, 2016

_____

*In the Matter of: MPM Silicones, L.L.C.*

_____

Nos. 15-1682 (L); 15-1824 (CON)

MOMENTIVE PERFORMANCE MATERIALS INCORPORATED, APOLLO
GLOBAL MANAGEMENT, LLC, AD HOC COMMITTEE OF SECOND LIEN
HOLDERS,
*Plaintiffs-Appellees,*

*v.*

BOKF, NA, AS FIRST LIEN TRUSTEE, WILMINGTON TRUST, N.A., AS 1.5
LIEN TRUSTEE,
*Defendants-Appellants.*

_____

No. 15-1771

U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE,
*Plaintiff-Appellant,*

*v.*

WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR INDENTURE
TRUSTEE, MOMENTIVE PERFORMANCE MATERIALS INCORPORATED, AD
HOC COMMITTEE OF SECOND LIEN NOTEHOLDERS, APOLLO
MANAGEMENT, LLC, AND CERTAIN OF ITS AFFILIATED FUNDS,
*Defendants-Appellees.*

_____

Appeals from the United States District Court
for the Southern District of New York.
Vincent L. Bricetti, *Judge*.

————

Submitted: November 9, 2016
Decided: October 20, 2017

————

Before: CABRANES, POOLER, and PARKER, *Circuit Judges*.

————

Three groups of creditors separately appeal a judgment of the United States District Court of the Southern District of New York (Bricetti, *J.*) affirming the confirmation of Debtors' Chapter 11 reorganization plan by the U.S. Bankruptcy Court (Drain, *J.*). The creditors argue that the plan improperly eliminated or reduced the value of notes they held. Debtors argue that the plan was properly confirmed and that these appeals should be dismissed as equitably moot. With one exception, we conclude that the plan confirmed by the bankruptcy court and affirmed by the district court comports with the provisions of Chapter 11. We remand so that the bankruptcy court can address the single deficiency we identify with the proceedings below which is the process for determining the proper interest rate under the cramdown provision of Chapter 11. We decline to dismiss these appeals as equitably moot.

————

DOUGLAS HALLWARD-DRIEMEIER, Ropes & Gray LLP, Washington D.C.; MARK R. SOMERSTEIN, MARK I. BANE, Ropes & Gray, New York, NY, *for Wilmington Trust, National Association as Indenture Trustee for the 1.5 Lien Notes*.

DANIELLE SPINELLI, JOEL MILLAR, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; PHILIP D. ANKER, ALAN E. SCHOENFELD, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY; MICHAEL J. SAGE, BRAIN E. GREER, Dechert LLP, New York, NY, G. ERIC BRUNSTAD, JR., Dechert LLP, Hartford, CT, *for BOKF, NA as First Lien Trustee*.

SUSHEEL KIRPALANI, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY; ROY T. ENGLERT, JR., MARK T. STANCIL, ALAN E. UNTEREINER, MATTHEW M. MADDEN, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C., *for U.S. Bank National Association, as Indenture Trustee*.

IRA S. DIZENGOFF, ABID QURESHI, BRIAN T. CARNEY, Akin Gump Strauss Hauer & Feld LLP, New York, NY; PRATIK A. SHAH, JAMES E. TYSSE, Z.W. JULIUS CHEN, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., *for Momentive Performance Materials Inc. and Apollo Management, LLC, and certain of its affiliated funds*.

JOSEPH T. BAIO, JAMES C. DUGAN, Willkie Farr & Gallagher LLP, New York, NY, *for Momentive Performance Materials Inc.*

DENNIS F. DUNNE, MICHAEL L. HIRSCHFELD, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, *for Ad Hoc Committee of Second Lien Noteholders*.

SETH H. LIEBERMAN, PATRICK SIBLEY, Pryor Cashman LLP, New York, NY, *for Wilmington Savings Fund Society, FSB, as Successor Indenture Trustee*.

RONALD J. MANN, Columbia Law School, New York, NY, *for Amici Curiae Loan Syndications and Trading Association, the Managed Funds Association, and the Securities Industry and Financial Markets Association*.

————

BARRINGTON D. PARKER, *Circuit Judge*:

These appeals by three groups of creditors challenge various aspects of Appellee Momentive Performance Materials, Inc.'s ("MPM,") substantially consummated plan of reorganization under Chapter 11 of the U.S. Bankruptcy Code.[1] With one exception, we conclude that the reorganization plan (the "Plan") confirmed by the bankruptcy court and affirmed by the district court comports with Chapter 11. We remand so that the bankruptcy court can address the single deficiency we identify in the proceedings below, which is the process for determining the proper interest rate under the cramdown provision of Chapter 11.

## I

MPM, a leading producer of silicone, faced serious financial problems after it took on significant new debt obligations beginning in

---

[1] Momentive Performance Materials, Inc.'s "MPM," and with affiliated debtors, "Debtors".

4

the mid-2000s.[2] *See* 15-1771 JA 286-88; 15-1682 JA 1605-06.[3] Following these debt issuances, MPM was substantially overleveraged, and ultimately filed a petition under Chapter 11. The four relevant classes of notes issued by MPM are as follows:

*Subordinated Notes.* In 2006, MPM issued $500 million in subordinated unsecured notes (the "Subordinated Notes") pursuant to an indenture (the "2006 Indenture"). 15-1771 JA 303. Appellant U.S. Bank is the indenture trustee for the Subordinated Notes. In 2009 MPM issued secured second-lien notes and offered the Subordinated Notes holders the option of exchanging their notes for the newly-issued second-lien notes. The second-lien notes were offered at a 60% discount but were secured. 15-1771 JA 2241. Holders of $118 million of the Subordinated Notes accepted the offer, leaving $382 million in unsecured Subordinated Notes outstanding. 15-1771 JA 2241.

*Second-Lien Notes.* In 2010, MPM issued approximately $1 billion in "springing" second-lien notes (the "Second-Lien Notes"). 15-1682 JA 1616; 15-1771 JA 476. The Second-Lien Notes were to be unsecured until the $118 million of previously exchanged Subordinated Notes were redeemed, at which point the "spring" in the lien would be triggered. 15-1771 JA 517, 580-81. Once triggered, the Second-Lien Notes would then (but only then) obtain a security interest in the Debtor's collateral. The exchanged Subordinated Notes were redeemed in November 2012, 15-1771 JA 721, at which point the trigger occurred and the Second-Lien Notes became secured with second-priority liens junior to other pre-existing liens on the Debtors'

---

[2] The facts recounted herein derive principally from the bankruptcy court's decision confirming Debtors' reorganization plan, *In re MPM Silicones, LLC*, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd* 531 B.R. 321 (S.D.N.Y. 2015), as well as the public disclosures made part of the record. We rely on the facts recounted in the bankruptcy court's ruling in light of our "oblig[ation] to accept the bankruptcy court's undisturbed findings of fact unless they are clearly erroneous." *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).

[3] As discussed, *infra* note 4, we resolve with this opinion three separate appeals. Our citations to the respective records will begin with the relevant docket number on appeal, and references to "JA" are to the respective joint appendices filed with that appeal. For example, our citation to "15-1771 JA 286-88" is to pages 286-88 of the joint appendix filed in the appeal brought by U.S. Bank, docketed No. 15-1771.

collateral. A primary issue on this appeal is whether the Second-Lien Notes have priority over the Subordinated Notes .

*Senior-Lien Notes.* In 2012, MPM again issued more debt, this time in the form of two classes of senior secured notes. Specifically, MPM issued $1.1 billion in first-lien secured notes (the "First-Lien Notes"), and $250 million in 1.5-lien secured notes (the "1.5-Lien Notes," and, with the First-Lien Notes, the "Senior-Lien Notes"). 15-1682 JA 1615. Appellants BOKF and Wilmington Trust are the indenture trustees for the First-Lien Notes and 1.5-Lien Notes, respectively. Pursuant to the governing indentures (the "2012 Indentures"), the Senior-Lien Notes were to be repaid in full by their maturity date of October 15, 2020. They carried fixed interest rates of 8.875% and 10%, respectively. The 2012 Indentures also called for the recovery of a "make-whole" premium if MPM opted to redeem the notes prior to maturity. Because the Second-Lien Notes and the Senior-Lien Notes are secured by the same collateral, the holders of those notes executed an intercreditor agreement (the "Intercreditor Agreement"), which provided that the Senior-Lien Notes stood in priority to the Second-Lien Notes as to their respective liens, but that each was junior to pre-existing liens on MPM's collateral. 15-1771 JA 691-718. Other primary issues on this appeal are whether the Senior-Lien Note holders are entitled to the make-whole adjustment and the cramdown interest rate they are entitled to if their Notes are replaced under the Plan.

## II

After these notes were issued, MPM experienced significant financial problems. *See* 15-1771 JA 284-88. In April 2014, MPM filed a petition under Chapter 11 and ultimately submitted a reorganization plan to the bankruptcy court. 15-1682 JA 3841-912. Several elements of that Plan are at issue on these appeals. The Plan provided for (i) a 100% cash recovery of the principal balance and accrued interest on the Senior-Lien Notes; (ii) an estimated 12.8%-28.1% recovery on the Second-Lien Notes in the form of equity in the reorganized Debtors; but (iii) no recovery on the Subordinated Notes. 15-1771 JA 271-74.

The Plan also gave the Senior-Lien Notes holders the option of (i) accepting the Plan and immediately receiving a cash payment of the

6

outstanding principal and interest due on their Notes (without a make-whole premium), or (ii) rejecting the Plan, receiving replacement notes "with a present value equal to the Allowed amount of such holder's [claim]," and then litigating in the bankruptcy court issues including whether they were entitled to the make-whole premium and the interest rate on the replacement notes. 15-1771 JA 271-72; 15-1682 JA 3873-75. The Senior-Lien Notes holders rejected the Plan, and, thus, elected the latter option.

The appellants here—the Subordinated Notes holders and the Senior-Lien Notes holders—opposed the Plan. (The Second-Lien Notes holders unanimously accepted it.) The Subordinated Notes holders, who were to receive nothing, contended that, under relevant indenture provisions, their Notes were not subordinate to the Second-Lien Notes holders and, consequently, they were entitled to some recovery. The Senior-Lien Notes holders opposed the Plan on the ground that the replacement notes they received did not provide for the make-whole premium, and carried a largely risk-free interest rate that failed to comply with the Code because it was well below ascertainable market rates for similar debt obligations and thus was not fair and equitable because it failed to give them the present value of their claim.

Despite these objections, the bankruptcy court confirmed the Plan following a four-day hearing. *In re MPM Silicones, LLC*, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015). Confirmation was facilitated by Chapter 11's "cramdown" provision, which allows a bankruptcy court to confirm a reorganization plan notwithstanding non-accepting classes if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

The bankruptcy court concluded that the Plan was fair to the Subordinated Notes holders, despite no recovery, because the 2006 Indenture called for their subordination to the Second-Lien Notes. *In re MPM Silicones, LLC*, 2014 WL 4436335, at *2-*11. It held the plan was fair to the Senior-Lien Notes holders because the 2012 Indentures did not require payment of the make-whole premium in the bankruptcy context and because the interest rate on the proposed replacement

7

notes, even though well below a "market" rate, was determined by a formula that complied with the Code's cramdown provision. *Id.* at \*11-\*32.

The bankruptcy court's confirmation order triggered an automatic 14-day stay during which Debtors could not consummate the Plan. *See* Fed. R. Bankr. P. 3020(e). Appellants aggressively took advantage of this period and attempted to block the implementation of the Plan. Specifically, prior to the expiration of the automatic stay, appellants moved in the bankruptcy court to extend the stay pending their appeal of the confirmation order, which the court denied. *See* 15-1682 JA 4099, 4173. They then promptly moved the district court for a stay, which was also denied. *See* 15-1682 JA 183, 185. Appellants then appealed the denial of the stay to this Court, and we dismissed the appeal for lack of jurisdiction. 15-1682 JA 4872-73. Despite these efforts, the Debtors contend this appeal is equitably moot, a contention with which we do not agree.

The appellants appealed the confirmation order to the district court which affirmed the bankruptcy court's confirmation order. 531 B.R. 321. The district court essentially agreed with the bankruptcy court, concluding that: (i) the relevant indentures unambiguously prioritize the Second-Lien Notes over the Subordinated Notes, *id.* at 326–31; (ii) the below market interest rate selected by the bankruptcy court complied with the Code, *id.* at 331–34; and (iii) under their indentures, the Senior-Lien Notes holders are not entitled to the make-whole premium in the context of a bankruptcy, *id.* at 335–38. The Subordinated Notes holders, the First-Lien Notes holders, and the 1.5-Lien Notes holders separately appealed.[4]

---

[4] The appeals by the First-Lien Notes holders (No. 15-1682) and 1.5-Lien Notes holders (No. 15-1824) were consolidated and heard in tandem with the appeal by the Subordinated Notes holders (No. 15-1771).

## III

"We exercise plenary review over a district court's affirmance of a bankruptcy court's decisions, reviewing *de novo* the bankruptcy court's conclusions of law, and reviewing its findings of facts for clear error." *In re Lehman Bros., Inc.*, 808 F.3d 942, 946 (2d Cir. 2015) (internal quotation marks omitted).

## IV

These appeals raise four issues. First, the Subordinated Notes holders challenge the lower courts' conclusions that their claims are subordinate to the Second-Lien Notes holders' claims. Second, the Senior-Lien Notes holders contend that the lower courts erroneously applied a below-market interest rate to their replacement notes. Third, the Senior-Lien Notes holders challenge the lower courts' rulings that they are not entitled to a make-whole premium. Finally, Debtors argue that we should dismiss these appeals as equitably moot. We find merit only in the Senior-Lien Notes holders' contention with respect to the method of calculating the appropriate interest rate for the replacement notes. We reject the others.

### A

The lower courts concluded that the Plan, which provided no distribution to the Subordinated Notes holders, complied with the governing 2006 Indenture. The Subordinated Notes holders argue this conclusion was erroneous because, under the terms of the 2006 Indenture, their claims are not subordinate to the Second-Lien Notes, whose holders recovered under the plan. The Debtors, on the other hand, contend that the 2006 Indenture gives the Second-Lien Notes priority over the Subordinated Notes. We agree with the Debtors, although for somewhat different reasons from the lower courts which found the relevant indenture provisions unambiguous. We find them to be ambiguous, but resolve the ambiguities in favor of the Debtors.

9

The Subordinated Notes holders' argument begins with Section 10.01 of the 2006 Indenture, which states that the Subordinated Notes are "subordinated in right of payment . . . to the prior payment in full of all existing and future Senior Indebtedness of the Company," and that "only Indebtedness of the Company that is Senior Indebtedness of the Company shall rank senior to the Securities in accordance with the provisions set forth herein." 15-1771 JA 404. Accordingly, the Second-Lien Notes stand in priority to the Subordinated Notes only if they constitute "Senior Indebtedness."

"Senior Indebtedness" in the 2006 Indenture begins with what the parties refer to as the "Baseline Definition," which defines Senior Indebtedness as:

> all Indebtedness . . . unless the instrument creating or evidencing the same or pursuant to which the same is outstanding expressly provides that such obligations are subordinated in right of payment to any other Indebtedness of the Company . . .

15-1771 JA 341.

It is undisputed that the Second-Lien Notes are not subordinated in right of payment to any other indebtedness and that therefore they satisfy the Baseline Definition of Senior Indebtedness. However, the Baseline Definition is then subject to six enumerated exceptions, the fourth of which (the "Fourth Proviso") excepts from Senior Indebtedness:

> any Indebtedness or obligation of the Company . . . that by its terms is subordinate or junior *in any respect* to any other Indebtedness or obligation of the Company . . . including any Pari Passu Indebtedness.

15-1771 JA 342 (emphasis added).

10

The Subordinated Notes holders argue that the Fourth Proviso carves out the Second-Lien Notes from the Baseline Definition, *i.e.*, that the Second-Lien Notes are an "[i]ndebtedness or obligation of the Company . . . that by its terms is subordinate or junior in any respect to any other Indebtedness of the Company." The Subordinated Notes holders rely heavily on the "in any respect" language. They argue that the Second-Lien Notes are subordinate to, for example, the First-Lien Notes—because, pursuant to the Intercreditor Agreement, the liens supporting the Second-Lien Notes are junior to the liens supporting the First-Lien Notes—and that they are therefore subordinate to other Indebtedness of the company.

The lower courts rejected this argument, and concluded that the Second-Lien Notes unambiguously constitute Senior Indebtedness despite the Fourth Proviso. They did so in reliance on a distinction between "lien subordination" and "payment (or debt) subordination," concluding that the Fourth Proviso unambiguously carves out from the Baseline Definition only the latter and not the former.[5] Because the Second-Lien Notes are not subordinate in *payment* to other note classes—but rather, the *liens* supporting their notes are subordinate—the lower courts concluded that the Second-Lien Notes are not covered by the Fourth Proviso.

We do not agree with the lower courts that the Fourth Proviso unambiguously incorporates a distinction between lien subordination and payment subordination. Rather, we conclude that the Fourth Proviso renders the definition of Senior Indebtedness ambiguous as to whether it includes the Second-Lien Notes. Nevertheless, we conclude

---

[5] The district court discussed in some detail the distinction between lien subordination and payment/debt subordination. 531 B.R. at 328. In short, "[l]ien subordination involves two senior creditors with security interests in the same collateral, one of which has lien priority over the other. . . . By contrast, in payment subordination, the senior lender enjoys the right to be paid first from all assets of the borrower or any applicable guarantor, whether or not constituting collateral security for the senior or subordinated lenders." *Id.*

11

that this ambiguity should be resolved in Debtors' favor given the plethora of evidence in the record that the parties intended the Second-Lien Notes to be Senior Indebtedness.

**1**

As discussed, the lower courts concluded that the Second-Lien Notes are unambiguously Senior Indebtedness. Under New York law, which governs the Indenture, a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties. The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous. Contract language is ambiguous if it is capable of more than one meaning.

We are not persuaded by the Debtors' (and lower courts') conclusion that the Fourth Proviso's reference to "subordinate . . . in any respect" unambiguously refers only to payment subordination and not to lien subordination. The Debtors read the Fourth Proviso as if it states "subordinate . . . *in right of payment*," which of course it does not. In so doing, the Debtors disregard the breadth of the term "in any respect," a term which is generally thought to be as broadly encompassing as possible.[6] And, as a practical matter, it seems to us illogical to believe that a second-lien holder does not possess an obligation that is meaningfully subordinate in some respect to a first-lien holder. These sophisticated parties knew how to cabin the type of subordination to which they refer; the indenture uses the term "subordinate . . . in right of payment" many times, including in the Baseline Definition itself.

Moreover, the Debtors' interpretation renders language in the indenture superfluous, which is a common sign of ambiguity. *See RJE*

---

[6] Debtors' attempt to downplay the significance of the term "in any respect" in this context is unconvincing given that the term appears nowhere else in the indenture other than in the Fourth Proviso.

12

*Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (in assessing ambiguity, courts consider the entire contract "to safeguard against adopting an interpretation that would render any individual provision superfluous" (internal quotation marks omitted)); *see also Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Trust Co. of New York*, 94 N.Y.2d 398, 404 (N.Y. 2000) (concluding that an interpretation that renders a portion of a contract superfluous is "unsupportable: under standard principles of contract interpretation). Specifically, if the Fourth Proviso only excepts debt subordinate in right of payment, there is no purpose for the "in right of payment" carve-out in the Baseline Definition. We disagree with the lower courts' attempts to interpret away this superfluity by finding a distinction between "expressly" (in the Baseline Definition) and "by its terms" (in the Fourth Proviso). We see no meaningful distinction between those terms.

Nevertheless, we also conclude that the Subordinated Notes holders' interpretation, that the Fourth Proviso unambiguously excludes the Second-Line Notes from the definition of Senior Indebtedness, is incorrect. As the lower courts correctly concluded, the Subordinated Notes holders' interpretation renders key parts of the Baseline Definition superfluous. Under their reading, that definition excludes from Senior Indebtedness only obligations subordinate "in right of payment," but the Fourth Proviso excludes all obligations that stand behind any type of other obligation. If so, the Baseline Definition's more limited carve-out for debt subordinate "in right of payment" would be unnecessary, because all such debt would be carved out from the definition of Senior Indebtedness by the Fourth Proviso.

As the Subordinated Notes holders correctly acknowledge, "[f]or this indenture, it simply is *not* possible to avoid superfluity." 15-1771 Br. of Appellant 54 (internal quotation marks omitted). Where, as here, varying interpretations render contractual language superfluous, we

13

are not obligated to arbitrarily select one as opposed to another. Because the 2006 Indenture is open to differing reasonable interpretations as to whether the Second-Lien Notes constitute Senior Indebtedness, we conclude that it is ambiguous as a matter of law.

**2**

Where a contract term is ambiguous, we look to extrinsic evidence to determine the intention of the parties. That evidence can include the parties' apparent intention, *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 264 (2d Cir. 1987), what would be commercially reasonable, *Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*, 20 N.Y.3d 438, 445 (2013), and the "parties' interpretation of the contract in practice, prior to litigation," *Ocean Transp., Inc. v. American Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984). Applying these tools, we conclude, as did the district court, that the parties understood that the Second-Lien Notes constituted Senior Indebtedness. *See* 531 B.R at 331 n.7.

First, MPM repeatedly represented to the Securities Exchange Commission and to the financial community that the Second-Lien Notes were Senior Indebtedness. It did so in its prospectuses, 8-Ks and 10-Ks. For example, it disclosed in a November 2010 8-K that the Second-Lien Notes are "senior indebtedness of the Company . . . and will rank . . . senior in right of payment to all existing and future subordinated indebtedness." 15-1771 JA 3057; *see also* 15-1771 JA 2231. It went further when it subsequently resold certain Subordinated Notes. In a May 2013 prospectus, MPM restated that the Subordinated Notes "are subordinated to all our existing and future senior debt, including the . . . Second-Priority Springing-Lien Notes." MPM also specifically identified as the first risk related to the Subordinated Notes that those holders' "right to receive payments on the Notes is junior to those lenders who have a security interest in our assets." 15-1771 JA 3007, 3010. MPM further asserted that in the event it were to file for

bankruptcy and were unable to repay its secured debt, "it is possible that there would be no assets remaining from which your claims could be satisfied." 15-1771 JA 3010. The Subordinated Note holders knew all of this because the Debtors were contractually obligated, pursuant to Section 4.02 of the 2006 Indenture, to provide copies of its 10-Ks, 10-Qs, 8-Ks, and all other required disclosures both to the Subordinated Note holders as well as to their Trustee—a highly sophisticated group of investors. 15-1771 JA 357. There is no dispute that these disclosures occurred. Consequently, it was widely understood in the investment community that the Second-Lien Notes had priority.

Second, the Subordinated Notes holders' interpretation generates the irrational outcome that the springing of the Second-Lien Notes' security interest, which was meant to enhance the note holders' protection, would actually strip those notes of their status as Senior Indebtedness and therefore their priority over the Subordinated Notes. As the bankruptcy court concluded, "[t]here is no logical reason for such a distinction, notwithstanding the subordinated noteholders' attempt to find one." 2014 WL 4436335, at *9.

Third, the Subordinated Notes holders' proposed interpretation that "in any respect" covers all junior liens would mean that no senior note classes would qualify as Senior Indebtedness because each was secured in some respect by a junior lien. For example, the First-Lien Notes were secured in part by a second priority lien on collateral securing a prepetition revolving credit facility. *See* 15-1771 JA 2425-26. We think it highly improbable that anyone understood this interpretation to be correct. Certainly MPM did not. For example, in a December 2012 prospectus MPM represented to the SEC that the Senior-Lien Notes were Senior Indebtedness. 15-1771 JA 3725. Because those note classes are subordinate to pre-existing liens as to the Debtors' collateral, they, too, would seemingly not qualify as Senior Indebtedness under the Subordinated Notes holders' interpretation. In light of these factors, we have little trouble concluding that the extrinsic evidence

15

establishes that the most reasonable interpretation of the Indenture is that the Second-Lien Notes are Senior Indebtedness. The judgment of the district court on that issue is, therefore, affirmed.

**B**

As a consequence of rejecting the Plan, the Senior-Lien Notes holders received replacement notes which pay out their claim over time. The Code permits debtors to make such "deferred cash payments" to secured creditors (*i.e.*, to "cramdown"). 11 U.S.C. § 1129(b)(2)(A)(i)(II). However, those payments must ultimately amount to the full value of the secured creditors' claims. *Id.* To ensure the creditor receives the full present value of its secured claim, the deferred payments must carry an appropriate rate of interest. *See Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993).

The rate selected by the lower courts for the Senior-Lien Note holders' replacement notes was based on the "formula" rate. The bankruptcy court selected interest rates of 4.1% and 4.85%, respectively, which were largely risk-free rates slightly adjusted for appropriate risk factors. It is not disputed that this rate is below market in comparison with rates associated with comparable debt obligations. The Debtors defend the application of the "formula" method on the ground that it is required by the plurality opinion in the Chapter 13 case of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

The Senior-Lien Notes holders contend that because this rate is too low, the Plan is not "fair and equitable" as required by § 1129(b). They argue that the lower courts should have applied a market rate of interest which is the rate MPM would pay to a contemporaneous sophisticated arms-length lender in the open market. The Senior-Lien Notes holders argued in the bankruptcy court that such a market exists and would generate interest in the 5-6+% range. *See* 15-1682 JA 464,

16

1941.[7]

The bankruptcy court rejected this approach, and concluded that a cramdown interest rate should "not take market factors into account." 2014 WL 4436335, at *25. Viewing itself as "largely governed by the principles enunciated by the plurality opinion in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004)," it concluded that the proper rate was what the plurality in *Till* referred to as the "formula" or "prime-plus" rate (discussed more fully below). *Id.* at *24, *26. The district court agreed. 531 B.R. at 332–34. The Senior-Lien Notes holders argue on appeal that the lower courts erred in concluding that the *Till* plurality opinion is wholly applicable to this Chapter 11 proceeding. In substantial part, we agree.

At issue in *Till* was a Chapter 13 debtor's sub-prime auto loan, carrying an interest rate of 21% and providing the creditor with a $4,000 secured claim. As with Chapter 11, Chapter 13 allows debtors to provide secured creditors with future property distributions (such as deferred cash payments) whose total 'value, as of the effective date of the plan, . . . is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). The question became, as here, how to calculate the interest on the deferred payments such that the creditor would receive the full value of its claim. No single interest-calculation method secured a majority vote on the Court, resulting in a plurality opinion endorsing the "formula" method.

The "formula" approach endorsed by the *Till* plurality instructs the bankruptcy court to begin with a largely risk-free interest rate,

[7] Debtors' reorganization plan proposed interest rates of 3.6% and 4.09%. *See* 2014 WL 4436335, at *24. However, the bankruptcy court concluded that those rates should be increased by 0.5% and 0.75%, respectively, in light of the fact that the base interest rate was pegged to the Treasury rate, rather than the prime rate (which reflects additional risk). *Id.* at *32. On appeal to the district court, the Senior-Lien Notes holders argued the bankruptcy court erred in not requiring the prime rate, an argument the district court rejected. 531 B.R. at 334-35. The Senior-Lien Notes holders do not press this argument here.

17

specifically, the "national prime rate . . . which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." 541 U.S. at 479. The bankruptcy court should then hold a hearing to determine a proper plan-specific risk adjustment to that prime rate "at which the debtor and any creditors may present evidence." *Id.* Using this approach, "courts have generally approved adjustments [above the prime rate] of 1% to 3%." *Id.* at 480.[8]

The *Till* plurality arrived at the "formula" rate after rejecting a number of alternative methods relied on by the lower courts. Significantly, it rejected methods relying on purported "market" rates of interest because those rates "must be high enough to cover factors, like lenders' transactions costs and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans." 541 U.S. at 477. The plurality then identified the only factors it viewed as relevant in properly ensuring that the sum of deferred payments equals present value: (i) the time-value of money; (ii) inflation; and (iii) the risk of non-payment. *Id.* at 474. The plurality concluded that the "formula" or "prime-plus" method best reflects those considerations.

Although *Till* involved a Chapter 13 petition, the plurality intimated that the "formula" method might be applicable to rate calculations made pursuant to other similarly worded Code provisions. In fact, it cited the Chapter 11 cramdown provision, 11 U.S.C. § 1129(b)(2)(A)(i)(II), among many other provisions, when it noted that

---

[8] Here, the bankruptcy court applied risk adjustments of 2.0% and 2.75%, which it added to the Treasury rate of 2.1% to arrive at interest rates of 4.1% and 4.85%, respectively. 2014 WL 4436335, at *32. Debtors assert in their briefing that the Treasury rate dropped by approximately 0.2% between the confirmation date and the plan's effective date, which thereby further lowered their notes' interest rate. 15-1682 Br. of Appellee at 11 n.3.

"[w]e think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these [Code] provisions." *Id.* at 474 & n.10.

Despite that language, however, the plurality made no conclusive statement as to whether the "formula" rate was generally required in Chapter 11 cases. And, notably, the plurality went on to state, in the opinion's much-discussed footnote 14, that the approach it felt best applied in the Chapter 13 context may *not* be suited to Chapter 11. Specifically, in that footnote , the Court stated that in Chapter 13 cramdowns "there is no free market of willing cramdown lenders." 541 U.S. at 476 n.14. It continued: "[i]nterestingly, the same is *not* true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id*. (internal citations omitted) (emphasis in original).[9]

Many courts have relied on footnote 14 to conclude that efficient market rates for cramdown loans cannot be ignored in Chapter 11 cases. Most notably, the Sixth Circuit, "tak[ing] [its] cue from Footnote 14" of the *Till* plurality, adopted a two-part process for selecting an interest rate in Chapter 11 cramdowns:

> [T]he market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the *Till* plurality.

---

[9] The Supreme Court has not subsequently spoken about the interest-calculation method to be applied in a Chapter 11 case. Nor have we.

*In re American HomePatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005). In applying this rule, courts have held that markets for financing are 'efficient' where, for example, "they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan." *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013).[10]

We adopt the Sixth Circuit's two-step approach, which, in our view, best aligns with the Code and relevant precedent. We do not read the *Till* plurality as stating that efficient market rates are irrelevant in determining value in the Chapter 11 cramdown context. And, disregarding available efficient market rates would be a major departure from long-standing precedent dictating that "the best way to determine value is exposure to a market." *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) (assessing a Chapter 11 cramdown); *see also United States v. 50 Acres of Land*, 469 U.S. 24, 25 & n.1 (1984) ("fair market value" is "what a willing buyer would pay in cash to a willing seller" (internal quotation marks omitted)). In *Bank of America*, the Court noted that "one of the Code's innovations [was] to narrow the occasions for courts to make valuation judgments," and expressed a "disfavor for decisions untested by competitive choice . . . when some form of market valuation may be available." *Bank of America*, 526 U.S. at 457-58.

The Senior-Lien Notes holders presented expert testimony in the bankruptcy court that, if credited, would have established a market rate. This evidence showed that if the Senior-Lien Noteholders were to have approved the Plan and accepted a cash-out payment for their notes, MPM would have had to secure exit financing to cover the lump-sum payment. In preparation for that possible eventuality (which did not

[10] Numerous courts, included in this Circuit, have followed the *American HomePatient* approach. *See, e.g., In re 20 Bayard Views, LLC*, 445 B.R. 83, 108-09 (E.D.N.Y. 2011) (collecting cases and deciding to "follow the majority approach" first outlined in *American HomePatient*).

come to pass in light of the Senior-Lien Notes holders' rejection of the Plan), MPM went out into the market seeking lenders to provide that financing. Those lenders quoted MPM rates of interest ranging between 5 and 6+%. *See In re MPM Silicones, LLC*, 2014 WL 4436335, at *29.

At these rates, the First-Lien Note holders contend that they would have received around $150 million more than the Plan offered, Br. of First-Lien Appellant 25, 33. The 1.5-Lien Note holders claim that the interest rate chosen by the lower courts led them to receive notes "valued by the market at *less than 93 cents* on the value of the secured claims," Br. of 1.5-Lien Appellant 20.[11] The Plan was objectionable to the Senior-Lien Notes holders because, in essence, it required them to lend Debtors a significant sum of money and receive a much lower rate of interest than any other lender would have received for offering the same loan to MPM on the open market.

When dealing with a sub-prime loan in the Chapter 13 context, "value" can be elusive because the market is not necessarily efficient and the borrower is typically unsophisticated. However, where, as here, an efficient market may exist that generates an interest rate that is apparently acceptable to sophisticated parties dealing at arms-length, we conclude, consistent with footnote 14, that such a rate is preferable to a formula improvised by a court. *See Bank of America*, 526 U.S. at 457; *see also In re Valenti*, 105 F.3d at 63 (the goal of the cramdown rate "is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately"); *see also* 15-1682 JA 3428 (First-Lien Notes holders' expert testifying that because the First-Lien Notes holders "are pricing it at the market . . . they're being compensated for the underlying risk that they are taking," and not for any "imbedded profit").

---

[11]   The Senior-Lien Notes holders offered evidence that the market price for their notes dropped, respectively, from 101.375% and 104.000% six days prior to the bankruptcy court's oral decision, to 94.375% and 92.563% nine days after that decision. 15-1682 JA 3991 ¶¶ 5-6, 8-9.

21

We understand that the complexity of the task of determining an appropriate market rate will vary from case to case. In some cases the task will be straightforward, in others it will be more complex. But, at the end of the day, we have no reason to believe the task varies materially in difficulty from the myriad tasks which we regularly rely on the expertise of our bankruptcy courts to resolve.

We therefore conclude that the lower courts erred in categorically dismissing the probative value of market rates of interest. We remand so that the bankruptcy court can ascertain if an efficient market rate exists and, if so, apply that rate, instead of the formula rate.[12] We arrive at no conclusion with regard to the outcome of this inquiry.

## C

The 2012 Indentures governing the Senior-Lien Notes contain Optional Redemption Clauses, which provide for the payment of a make-whole premium[13] (referred to as the "Applicable Premium" in the indentures) if MPM were to "redeem the Notes at its option" prior to October 15, 2015. 15-1682 JA 2322.[14] The make-whole premium was

---

[12] We acknowledge that the lower courts grappled with the Senior-Lien Notes holders' evidence regarding MPM's quoted exit financing, and made express their view that the rate produced by that process may not in fact have been produced by an efficient market. 2014 WL 4436335, at *26, *29; 531 B.R. at 334 n.9. Nevertheless, Judge Drain left no ambiguity that he applied the "formula" approach for Chapter 13 individual bankruptcy cases as dictated by the *Till* plurality and, in so doing, explicitly declined to consider market forces. *See* 2014 WL 4436335, at *25-*26; *see also id.* at * 28 ("I conclude that [the *American HomePatient*] two-step method, generally speaking, misinterprets *Till*"). Judge Briccetti agreed with this approach. 531 B.R. at 334. As discussed, this was in error. The bankruptcy court should have the opportunity to engage the *American HomePatient* analysis in earnest.

[13] A make-whole premium is a "contractual substitute for interest lost on Notes redeemed before their expected due date." *In re Energy Future Holdings Corp.*, 842 F.3d 247, 251 (3d Cir. 2016) ("*EFH*"). As stated by the bankruptcy court, its purpose "is to ensure that the lender is compensated for being paid earlier than the original maturity of the loan for the interest it will not receive . . . ." 2014 WL 4436335, at *15.

[14] We cite in this section to the indenture for the First-Lien Notes; the indenture for the 1.5-Lien Notes is identical for relevant purposes.

intended to ensure that the Senior-Lien Notes holders received additional compensation to make up for the interest they would not receive if the Notes were redeemed prior to their maturity date.

In October 2014, the Debtors, pursuant to the Plan, issued replacement notes to the Senior-Lien Notes holders, which did not account for the make-whole premium. These holders contended that the failure to include that premium violated the 2012 Indentures. The bankruptcy court concluded that the Senior-Lien Notes holders were not entitled to the premium. It reasoned that under the 2012 Indentures the make-whole premium would be due only in the case of an "optional redemption" and not in the case of an acceleration brought about by a bankruptcy filing. 2014 WL 4436335, at *11-*15. The district court agreed. 531 B.R. at 335-38. We too agree.

The Senior-Lien Notes holders claim entitlement to the make-whole premium for essentially three reasons: (i) they are entitled to the make-whole under the 2012 Indentures' Optional Redemption Clauses; (ii) they are entitled to it under the 2012 Indentures' Acceleration Clauses; and (iii) even if the indentures did not allow for a make-whole premium upon acceleration, they should not have been permanently barred from exercising their contractual right to rescind acceleration and thereby obtain the make-whole premium.

**1**

The Senior-Lien Notes holders' principal argument is that they are entitled to the make-whole premium because when MPM issued the replacement notes under the Plan, it "redeemed" the Notes "at its option" prior to maturity. This argument fails for the same reasons we rejected nearly identical arguments in *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013). There we rejected the note holders' argument that they were entitled to a make-whole premium following a debtor's bankruptcy filing. We concluded that:

23

American's bankruptcy petition triggered a default, and this default automatically accelerated the debt. That acceleration changed the date of maturity from some point in the future . . . to an earlier date based on the debtor's default under the contract. . . . When the event of default occurred and the debt accelerated, the new maturity for the debt was November 29, 2011 [the date of the bankruptcy petition]. Consequently, American's attempt to repay the debt in October 2012 was not a voluntary prepayment because [p]repayment can only occur *prior* to the maturity date.

*Id.* at 103 (internal citations and quotation marks omitted).

The Senior-Lien Notes holders argue *AMR* is inapplicable because it spoke only to "prepayment" rather than "redemption." As the district court noted, the principle of *AMR* does not turn on the distinction between "prepayment" and "redemption." 531 B.R. at 336-37. In fact, in *AMR* we stated that because "American's debt was accelerated . . . upon its bankruptcy filing [it] is not now voluntarily redeeming the notes." *AMR*, 730 F.3d at 109.

We also held in *AMR* that acceleration brought about by a bankruptcy filing changes the date of maturity of the accelerated notes to the date of the petition. 730 F.3d at 103. Therefore, any payment on the accelerated notes following a bankruptcy filing would be a *post-*maturity payment. And, as the First-Lien Notes holders concede, the "plain meaning of the term 'redeem' is to 'repay[] . . . a debt security . . . *at or before* maturity.'" 15-1682 Br. of First-Lien Appellant 39 (emphasis added). Here, Debtors' payment was *post*-maturity, not "at or before" maturity. *But see In re Energy Future Holdings Corp.*, 842 F.3d 247, 255 (3d Cir. 2016). Moreover, even assuming MPM's issuance of the replacement notes was a "redemption," it would not have been "at [*MPM's*] option," as required to trigger the Optional Redemption

24

Clauses. Rather, the obligation to issue the replacement notes came about automatically by operation of separate indenture provisions, the Automatic Acceleration Clauses. A payment made mandatory by operation of an automatic acceleration clause is not one made at MPM's option. *See AMR*, 730 F.3d at 100–01.

**2**

As discussed, the 2012 Indentures each contain an Acceleration Clause, which calls for the acceleration of payment of the Senior-Lien Notes under certain conditions constituting an Event of Default. Pursuant to Section 6.01(g), one such event is MPM's filing of a voluntary bankruptcy petition. Although most Events of Default allow the Senior-Lien Notes holders the *option* of accelerating payment, a default brought about by MPM's voluntary bankruptcy petition leads to an *automatic* acceleration under Section 6.02.[15]

The Senior-Lien Notes holders argue that the term "premium, if any" in the Acceleration Clauses requires that the make-whole premium is due upon an automatic acceleration. This argument fails in light of our conclusion that the Senior-Lien Notes holders are not entitled to the make-whole premium under the Optional Redemption Clauses. In other words, the make-whole premium is not due pursuant to the Acceleration Clauses' reference to "premium, if any," for the simple reason that the more specific Optional Redemption Clauses which grant the make-whole are not triggered and thus no premium has been generated. *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (noting that "it is a fundamental rule of contract construction that specific terms and exact terms are given greater weight than general language" (internal quotation marks omitted)).

---

[15] Section 6.02 provides: "If an Event of Default specified in Section 6.01(f) or (g) with respect to MPM occurs, the principal of, premium, if any, and interest on all the Notes shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holders." 15-1682 JA 2260.

25

**3**

Finally, the Senior-Lien Notes holders argue that the lower courts erred in disregarding their contractual right to rescind acceleration,[16] a right that if invoked would have reinstated the original maturity date and thereby kept the Optional Redemption Clauses (and therefore the make-whole premium) in effect.

*AMR* forecloses this argument as well. There, considering nearly identical indenture language, we concluded that a creditor's post-petition invocation of a contractual right to rescind an acceleration triggered automatically by a bankruptcy filing is barred because it would be "an attempt to modify contract rights and would therefore be subject to the automatic stay." 730 F.3d at 102; *see also id.* at 102-03 ("any attempt by U.S. Bank to rescind acceleration now—after the automatic stay has taken effect—is an effort to affect American's contract rights, and thus the property of the estate").

The Senior-Lien Notes holders again attempt to distinguish *AMR* by relying on the fact that the acceleration provision there, unlike the one here, expressly disavowed the make-whole premium. According to the 1.5-Lien Notes holders, our concern in *AMR* was therefore with not allowing the creditors "an end-run around their bargain by rescission." 15-1682 Br. of 1.5-Lien Appellant 45. This argument fails because, although the provisions at issue here do not expressly disallow the make-whole premium, the Optional Redemption Clauses, as we have seen, achieve this result. Therefore, just as in *AMR*, because the right to rescind acceleration here would serve as "an end-run around their bargain by rescission," the lower courts correctly concluded that the automatic stay barred rescission of the acceleration of the Notes.

---

[16] "Holders of a majority in principal amount of outstanding Notes by notice to the Trustee may rescind any such acceleration with respect to the Notes and its consequences." 15-1682 JA 2260.

**V**

Debtors seek dismissal of these appeals under the principle of equitable mootness, a "prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005).[17] The doctrine "allows appellate courts to dismiss bankruptcy appeals 'when, during the pendency of an appeal, events occur' such that 'even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" *In re Motors Liquidation Co.*, 829 F.3d 135, 167 (2d Cir. 2016) (quoting *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993) ("*Chateaugay II*")). The doctrine requires us to "carefully balance the importance of finality in bankruptcy proceedings against the appellant's right to review and relief." *In re Charter Commc'ns. Inc.*, 691 F.3d 476, 481 (2d Cir. 2012). With these principles in mind, we decline to dismiss any of these appeals as equitably moot.

Where, as here, a reorganization plan has been substantially consummated, we presume that an appeal of that plan is equitably moot. *In re BGI, Inc.*, 772 F.3d 102, 104 (2d Cir. 2014). That presumption, however, gives way where five factors first identified in *Chateaugay II* are met. They are, where: (i) effective relief can be ordered; (ii) relief will not affect the debtor's re-emergence; (iii) relief "will not unravel intricate transactions"; (iv) affected third-parties are notified and able to participate in the appeal; and (v) appellant diligently sought a stay of the reorganization plan. *In re Charter*, 691 F.3d at 482.

---

[17] Debtors filed with the district court a motion to dismiss the appeal of the bankruptcy court's confirmation order on the basis of equitable mootness. 15-1771 JA 4570-88. The district court made no ruling on the motion, concluding it was "mooted by this Court's decision to affirm the Orders of the Bankruptcy Court." 531 B.R. at 338 n.14. Debtors then filed motions to dismiss on equitable mootness grounds with this Court, 15-1682 Doc. 58; 15-1771 Doc. 62, which we summarily denied without prejudice to Debtors "rais[ing] the issue . . . in their merits brief," 15-1682 Doc. 159; 15-1771 Doc. 102.

27

Although we require satisfaction of each *Chateaugay II* factor to overcome a mootness presumption, we have placed significant reliance on the fifth factor, concluding that a "chief consideration under *Chateaugay II* is whether the appellant sought a stay of confirmation." *In re Metromedia*, 416 F.3d at 144. Along these lines, we concluded that "[i]f a stay was sought, we will provide relief if it is at all feasible, that is, unless relief would 'knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court.'" *Id.* (quoting *Chateaugay II*, 10 F.3d at 953).

A special emphasis on this factor is sound. Equitable mootness issues only arise in earnest following a judicial determination that some facet of a reorganization plan violates the Code. It is generally considered inappropriately harsh to deny relief to which one is entitled on the purportedly equitable ground that the unfair (or illegal) plan has been put into effect, especially where a creditor took all appropriate steps to secure judicial relief. In such a case, we have held that it is proper to "provide relief if it is at all feasible." *Id.*

Here, the appellants immediately objected to various provisions of the Plan and promptly and consistently sought a stay in three different courts. Thus their diligence is not in question. Debtors nevertheless argue that these appeals should be dismissed as moot because of the cascading effects of rewriting the plan were the appellants to prevail. Specifically, they argue that "granting the Noteholders' relief would alter a critical piece of the Plan resulting from the intense-multi-party negotiation, thereby impact[ing] other terms of the agreement and throw[ing] into doubt the viability of the Plan," and that according such relief "would cause debilitating financial uncertainty" to the emergent Debtor. 15-1682 Br. of Appellees 69, 71 (internal quotation marks omitted).

In light of the limited nature of the remand we order, we do not believe these concerns will materialize. On remand, the bankruptcy

28

court will only be called on to re-evaluate the interest to be received on the replacement notes held by the Senior-Lien Notes holders. The Debtors acknowledge that this might require, at most, $32 million of additional annual payments over seven years. 15-1682 Br. of Appellees 69. The Debtors will not have to pay out the nearly $200 million they assert would be required to pay the Senior-Lien Notes holders' make-whole premium, nor will any redistribution be required to the Subordinated Notes holders, as to which the plan is fair. In fact, our judgment allows for no redistribution other than that from the Debtors to the Senior-Lien Notes holders.

Given the scale of Debtors' reorganization, we are not persuaded that a payment of, perhaps, $32 million in annual payments over seven years, with no other redistribution from other creditors or third parties, would unravel the plan, threaten Debtors' emergence, or otherwise materially implicate the concerns identified in *Chateaugay II*.

Our conclusion is supported by the findings of the lower courts, which had intimate familiarity with the Debtors' financial condition and the transactions that will arise from the reorganization. Although it made no determinative ruling as to equitable mootness, the bankruptcy court opined that "the risk of equitable mootness is not strong here *for either set of movants* . . . the senior secured lender set of movants and the senior subordinated noteholder movants." 15-1682 JA 4165 (emphasis added). The district court agreed. 15-1682 JA 4837 ("I agree with Judge Drain that the risk of equitable mootness here is not very great . . ."). Debtors' request that we dismiss these appeals as equitably moot is denied.

29

## VI

To summarize, we conclude as follows:

1. The Second-Lien Notes stand in priority to the Subordinated Notes.
2. The Senior-Lien Notes holders are not entitled to the make-whole premium.
3. The lower court erred in the process it used to calculate the interest rate applicable to the replacement notes received by the Senior-Lien Notes holders. On remand, the bankruptcy court should assess whether an efficient market rate can be ascertained, and, if so, apply it to the replacement notes.
4. We decline to dismiss any of these appeals as equitably moot.

For the foregoing reasons, we **AFFIRM** the District Court's order in part, with respect to the priority of the Subordinated Notes and the Senior-Lien Notes holders' entitlement to a make-whole premium; **REVERSE** the order in part, with respect to the method of calculating the interest rate on the Senior-Lien Notes holders' replacement notes; and **REMAND** the matter for further proceedings consistent with this opinion.